IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| MICHAEL J. COREY )<br>Plaintiff, ) | Civil Action No. 06 - 852 |
| )<br>v. ) | Judge Gary L. Lancaster |
| ) | Magistrate Judge Lisa P. Lenihan |
| MICHAEL J. ASTRUE )<br>COMMISSIONER OF SOCIAL SECURITY, )<br>Defendant. ) | |

## REPORT AND RECOMMENDATION

I. Recommendation

It is respectfully recommended that the Plaintiff's Motion for Summary Judgment (Docket No.9 ) be denied, that the Defendant's Motion for Summary Judgment (Docket No.13 ) be granted, and that the decision of the Commissioner of Social Security to deny Plaintiff's application for disability insurance benefits and supplemental security income be affirmed.

II. Report

Presently before the Court for disposition are cross motions for summary judgment.

A. Procedural History

On January 18, 2007, Michael Corey ("Plaintiff"), by his counsel, timely filed a complaint pursuant to Section 205(g) of the Social Security Act, as amended, 42 U.S.C. 405(g) for review of the Commissioner's final determination disallowing his claim for disability insurance benefits ("DIB") or eligible for supplemental security income ("SSI") under Titles II and XVI of the Social Security Act (the "Act").  On July 18, 2003, Plaintiff protectively filed an application for DIB and SSI alleging that he had been disabled since June 1, 2003 due to severe depression.  His applications were denied at the initial level of review.   Plaintiff timely

requested a hearing before an Administrative Law Judge ("ALJ Andrews") on the denial of both DIB and SSI claims.  On June 1, 2005 a hearing was held before ALJ Andrews.

On December 15, 2005, ALJ Andrews issued a decision finding that Plaintiff was not disabled within the meaning of the Act.  ALJ Andrews concluded that while Plaintiff suffers from depressive disorder and personality disorder, these medically determinable impairments do not meet or medically equal any of the listed impairments in Appendix 1, Subpart P, Regulation No. 4. (Finding No. 4).  ALJ Andrews further determined that, although Plaintiff could not return to his past relevant work, he retained the residual functional capacity ("RFC") to perform a significant range of work at all exertion levels as long as the work did not impose excessive mental demands.  (Finding No. 6)  Based on testimony from a vocational expert that work exists in significant numbers in the national economy, ALJ Andrews denied Plaintiff's claim.  (Finding No. 12)  The Appeals Council denied review and Plaintiff then filed the present action in this Court requesting remand.[1]

The issue before this Court is whether the decision of the Commissioner denying Plaintiff's claims for DIB and SSI benefits is supported by substantial evidence.  In particular, Plaintiff complains on appeal that ALJ Andrews' decision is not supported by substantial evidence and challenges it on the grounds that ALJ Andrews erred in: (1) relying on "highly selective" facts; (2) his failure to acknowledge the Intensive Care Manager's ("ICM") testimony;

---

[1] The record shows that Plaintiff, through his attorney, filed additional evidence to the Appeals Council in support of his position of disability in the form of a letter from Dr. David E. Ness dated Feb. 15, 2006, two months after ALJ Andrew's decision.  This letter states that Dr. Ness "would strongly support [Plaintiff] being regarded as disabled....."  Although Dr. Ness, who saw Plaintiff only after the ALJ Hearing, states that this assessment is shared by Plaintiff's therapist, Dr. Buttenfield, it does not appear that the latter expresses such an opinion in the medical record provided to the court.  (T.R. 360)

(3) his failure to evaluate Plaintiff's credibility in light of his past work history; and (4) relying on a hypothetical posed to the vocational expert ("VE") which did not fully reflect Plaintiff's limitations.[2]  Defendant argues, however, that the Commissioner's decision is supported by substantial evidence.

      B. Statement of Facts

      **1. General Background**

Plaintiff was born on December 7, 1942, making him 62 years old at time of the hearing, and has recently received a high school equivalency diploma.  His prior work was as a short-order cook.  Plaintiff's earnings record documents 31 years of continuous work, 20 at his most recent employer.  The VE described this work as a light, skilled job.  Plaintiff last worked on July 3rd, 2003.  Plaintiff is twice divorced.   He was married to his second wife for 25 years, but was recently divorced following learning of his wife's infidelity, knowledge of which also precipitated his first suicide attempt.[3]

      **2. Medical History**

Plaintiff alleges disability beginning on June 1, 2003 due to depression and mental stress.  Plaintiff was hospitalized on June 4, 2003, after a suicide attempt in which he swallowed 20 to 30 Tylenol after learning of his wife's affair and was drinking "off and on." (T.R. 134)  During his hospitalization he was diagnosed with Major Depressive disorder and was started on Lexapro, an antidepressant.  He was discharged two days later, on June 6, 2003.

---

[2]  See Plaintiff's Brief in Support of Motion for Summary Judgment at p.15

[3]  The parties have two adult children from this marriage.

Following discharge, Plaintiff sought outpatient treatment for depression at Western Psychiatric Institute and Clinic ("WPIC"). He underwent a psychological evaluation on June 12th at the Drake Counseling Center and was assessed with a GAF score of 50.[4] Plaintiff was admitted to the emergency room at WPIC on July 7, 2003. (T.R. 328) He had increasing depression and anger with suicidal and homicidal ideation. He was again diagnosed with major depressive disorder, and alcohol abuse. His medication was changed to Effexor and Trazodone. Plaintiff felt that the new medication improved his mood and he was discharged on July 14, 2003. (T.R. 328) Following discharge he continued outpatient therapy at WPIC.

On August 1, 2003 Plaintiff was involuntarily committed, at his wife's request, for active suicidal ideation and depression. (T.R. 309) According to his wife, Plaintiff had a history of drinking heavily, had not been drinking frequently over the prior few months, but had become intoxicated several times recently. Plaintiff was extremely angry at his wife and members of the staff while at WPIC and was diagnosed with Intermittent Explosive Disorder along with the previous diagnosis of major depression. In addition to his other medication, he was prescribed Tegretol to help treat his impulse control. While at the hospital, he was assessed with a GAF

---

[4] A global assessment of functioning ("GAF") score is used to report an individual's overall level of functioning with respect to psychological, social, and occupational functioning. The GAF score is divided into ten ranges of functioning (0-100). A GAF rating is within a particular decile if either the symptom's severity or the level of functioning falls within the range. A GAF score of between 41 and 50 generally indicates a serious impairment in social, occupational, or school functioning. See Diagnostic and Statistical Manual of Mental Disorders ("DSM-IV-TR") pp. 32-34 (American Psychiatric Association, Task Force on DSM-IV (4th ed. (Text Revised) 2000).

score of 20, but had improved to a score of 50 by the time he was discharged.[5] (T.R. 312) Plaintiff was discharged on Aug. 12, 2003.

At the request of the Commissioner, Plaintiff underwent a consultative psychological evaluation with Dr. Linda Rockey on September 16, 2003. (T.R. 161) Dr. Rockey's diagnosis was consistent with those of Plaintiff's service providers, i.e. diagnosed Major Depressive disorder, without psychotic features, and a history of alcohol abuse. She assessed him at a GAF of 50. (T.R. 164) Dr. Rockey further concluded that Plaintiff had no or slight impairment in carrying out detailed instructions, making judgments and work-related decisions, and interacting with others; and that he was only mildly impaired in his ability to respond to work related pressures. She opined that Plaintiff's prognosis for returning to gainful employment at that time was unlikely, due to his attendance at a dual diagnosis program at WPIC for depression and substance abuse for up to 25 hours a week, 5 days a week. She also noted that Plaintiff's age, i.e. 60, might preclude him from finding employment. (T.R. 165)

In October Plaintiff was staying with a friend because his wife had thrown him out of their house. On Oct. 7, 2003 Plaintiff was re-admitted to WPIC and on Oct. 8 he signed an "Against Medical Advice" form as he felt the treatment was not helpful. On Oct. 10, Plaintiff was again involuntarily committed after becoming extremely angry and uncooperative with treatment. (T.R. 278) He indicated that he was still upset about his wife's affair and had suicidal ideation, and had stopped taking his medication because it was too expensive and did not help.

---

[5] A GAF score of between 11 and 20 indicates some danger of hurting one's self or others OR occasionally fails to maintain minimal personal hygiene OR gross impairment in communication. See Diagnostic and Statistical Manual of Mental Disorders ("DSM-IV-TR") pp. 32-34

He was assessed with a GAF of 21, which increased to 55 by discharge.[6] (T.R. 280) He was placed back on Lexapro and also prescribed Risperdal. Plaintiff responded to treatment and his behavior became more controlled. He denied suicidal ideations and was discharged on Oct. 14, 2003. (T.R. 279) Upon discharge, he returned to his home with his wife and began attending an intensive outpatient program ("IOP"), which included daily group therapy sessions.

On Oct. 31, 2003 Plaintiff submitted to a second consultative psychological examination with Dr. Lawrence B. Haddad, Ph.D. at the request of the Commissioner. (T.R. 174) Dr. Haddad's report indicates Plaintiff appeared depressed and dysphoric, admitted drinking heavily since the conflict with his wife, and admitted that he had again been thrown out of the house by his wife. Dr. Haddad found that Plaintiff could maintain some daily functions such as light cleaning, shopping, and cooking, but was socially distant and immature. (T.R. 177) He further concluded that Plaintiff's concentration and task persistence were impaired, but he could perform simple non-stressful activities. Dr. Haddad's diagnosis was that Plaintiff was experiencing a major depressive episode with continued suicidal thoughts. (T.R. 176) He found that Plaintiff had a hard time focusing and would likely have difficulty carrying out usual work activities, but that he could perform simple, non-stressful activities within a schedule. (T.R. 177)

On Nov. 3, 2003 Plaintiff was voluntarily admitted to WPIC following his second attempted narcotic-suicide, this time by overdose on Tegretol and Advil. (T.R. 250) During admission he complained of ongoing marital problems. He was assessed with a GAF score of

---

[6] A GAF score of between 51 and 60 indicates moderate symptoms OR any moderate difficulty in social, occupational, or school functioning. See Diagnostic and Statistical Manual of Mental Disorders ("DSM-IV-TR") pp. 32-34

20, improving to a score of 46 on discharge. (T.R. 255) He cooperated with treatment and was restarted on Effexor and Seroquel while at the hospital. He was discharged on Nov. 11, 2003.

Following his discharge, Plaintiff met with Dr. Milke, who conducted a Mental Residual Functional Capacity Assessment ("RFC"). (T.R. 180) During this evaluation, Dr. Milke found that Plaintiff's limitations ranged from not significant to moderate.[7] He states (as had prior physicians and consultants) that the evidence established a medically-determinable impairment of Major Depressive Disorder and personality disorder, but states Plaintiff was at most only moderately limited in his capacity to sustain all exertional levels over a normal workday each workweek. (T.R. 193) Additionally, Dr. Milke concluded that Plaintiff would be able to maintain regular attendance, to maintain concentration for extended periods of time, make decisions, and to function in production-oriented jobs requiring independent decision making. (T.R. 195) His only noted limitations were with work stresses and public contact. Dr. Milke's evaluation concluded that Plaintiff "*is able to meet the basic mental demands of competitive work on a sustained basis despite the limitations resulting from his impairment.*" (T.R. 196)

Plaintiff resumed outpatient therapy at WPIC in December 2003 and continued until February 2004. During this time he participated in group sessions as well as periodic individual consultations with his therapist, Tiffany Painter. Plaintiff complained of crying spells, hopelessness, decreased interest and motivation, decreased energy, and suicidal ideation. (T.R. 248) At the end of February he began individual sessions with Helen Kiderman at WPIC, completing 12 sessions over the seven month period of February to August of 2004. During this time Plaintiff was divorced from his wife and living with his sister. (T.R. 242, 237) During

---

[7] As noted on the RFC form, "markedly limited" and "extremely limited" meet the standard for "disability" under the Act. "Moderate" limitations are not sufficient to meet the standard.

initial appointments Plaintiff continued to complain of crying spells and decreased energy, but by August 2004 Plaintiff reported having "mostly good mood" for 5 days each week and 2 days when he felt down; he also continued to feel that nothing was going his way. (T.R. 214)

During this time frame Plaintiff was also seen by Dr. Fornal, M.D., a treating psychiatrist, for evaluation. In April 2004, Dr. Fornal noted that Plaintiff was suffering humiliation related to the dissolution of his marriage; Dr. Fornal diagnosed him with adjustment disorder, depression, and alcohol abuse. (T.R. 232) He assessed Plaintiff with a GAF score of 55. Dr. Fornal also changed Plaintiffs medications, prescribed Remeron, and re-started him on Seroquel. During his second April visit, Plaintiff was assessed with a GAF score of 60. (T.R. 228)

In May 2004, Dr. Fornal noted that Plaintiff still felt that life was too stressful for him to consider employment because he felt "wronged" by his wife. (T.R. 224). Plaintiff reported feeling withdrawn, but without any suicidal ideation. Plaintiff stated "I'm thinking more of living." He was mostly compliant with medication and was continued on the prescriptions. He was assessed with a stable GAF score of 60 in May and again at his last appointment with Dr. Fornal in June.[8] (T.R. 221, 224) Plaintiff stated that his medication "helped his mood."

In July 2004 Plaintiff began to see Dr. Charles Franchino for medication management. Plaintiff's mood had been stabilized by the medication and his main complaint at this point was of boredom. He was assessed with a GAF of 50. (T.R. 218) At this time he reported to his

---

[8] Included in Plaintiff's medical file is a letter, dated May 3, 2004, from his Intensive Care Manager ("ICM"), Jennifer Curran, indicating that he was not capable of returning to work. It is unclear from the record the period of time for which Curran was Plaintiff's ICM. There is also an *undated* letter from another ICM, Frank White, which states that, in his opinion, Plaintiff was not capable of returning to work due to his mental health issues.

individual therapist, Helen Kiderman, that he played computer games, watched TV, visited friends, and occasionally went to a local bar. (T.R. 216) By the next month Plaintiff reported that, while he was still upset about losing his wife and felt no motivation to return to work, he otherwise felt "great." Dr. Franchino also reported that Plaintiff was less irritable and angry. (T.R. 212)

In February 2005 Plaintiff met with Dr. Franchino again and reported marked improvement. (T.R. 199) Plaintiff noted that his mood was improved, that he was much less anxious, and that he had no further thoughts of harming his ex-wife. He reported that both his suicidal and homicidal ideation were fully resolved and he had good impulse control, insight, and judgment. (T.R. 199) He was assessed with a GAF of 50 and continued on his medication.

On February 28th Plaintiff met with Dr. Philip Buttenfield to begin individual therapy. During this initial session Plaintiff denied any problems but went on to spontaneously summarize his situation as "no home, no job, no income." He agreed to biweekly appointments to resolve his feelings about his divorce. (T.R. 198) See *supra* note1.

C. "Substantial Evidence" Standard of Review

In reviewing an administrative determination of the Commissioner, the question before any court is whether there is substantial evidence in the agency record to support the findings of the Commissioner that the plaintiff failed to sustain his burden of demonstrating that he was disabled within the meaning of the Social Security Act. 42 U.S.C. §405(g). See also, e.g., Richardson v. Perales, 402 U.S. 389 (1971); Adorno v. Shalala, 40 F.3d 43 (3d Cir. 1994). More specifically, 42 U.S.C. §405(g) provides:

> The court shall have power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a

-9-

rehearing.  The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive.

Substantial evidence is defined as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Hartranft v. Apfel, 181 F.3d 358, 360 (3d Cir. 2000) (citing Pierce v. Underwood, 487 U.S. 552, 565 (1988)); Plummer v. Apfel, 186 F.3d 422 (3d Cir. 1999).  Although there may be contradictory evidence in the record, it is not cause for remand or reversal of the Commissioner's decision if substantial support exists.  Skyes v. Apfel, 228 F.3d 259, 262 (3d Cir. 2000).

D. Disability Evaluation

The issue before the Court for immediate resolution is a determination of whether there is substantial evidence to support the findings of ALJ Andrews that the plaintiff was not disabled within the meaning of the Act.

The term "disability" is defined in 42 U.S.C. §423(d)(1)(A) as:

inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months....

The requirements for a disability determination are provided in 42 U.S.C. §423(d)(2)(A):

An individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work.  For purposes of the preceding sentence 'work which exists in the national economy' means work which exists in significant numbers either in the region where such individual lives or in several regions of the country.

A "physical or mental impairment" is "an impairment that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." 42 U.S.C. §423(d)(3).[9]

Finally, the applicable regulations set forth a more explicit five-step evaluation to determine disability. The regulations, published at 20 C.F.R. §§404.1501-1529, set forth an orderly and logical sequential process for evaluating all disability claims.[10] In this sequence, the ALJ must first decide whether the plaintiff is engaging in substantial gainful activity. If not, then the severity of the plaintiff's impairment must be considered. If the impairment is severe, then it must be determined whether it meets or equals the "Listings of Impairments" in Appendix 1 of the Regulations which the Commissioner has deemed of sufficient severity to establish disability. If the impairment does not meet or equal the Listings, then it must be ascertained whether the plaintiff can do his past relevant work. If not, then the residual functional capacity ("RFC") of the plaintiff must be ascertained, considering all the medical evidence in the file, to

---

[9] In reviewing a disability claim, the Commissioner must consider subjective symptoms as well as the medical and vocational evidence. See Green v. Schweiker, 749 F.2d 1066, 1068 (3d Cir. 1984) (explaining that "subjective complaints of pain [should] be seriously considered, even where not fully confirmed by objective medical evidence"); Bittel v. Richardson, 441 F.2d 1193, 1195 (3d Cir. 1971) ("Symptoms which are real to the claimant, although unaccompanied by objective medical data, may support a claim for disability benefits, providing, of course, the claimant satisfies the requisite burden of proof.")(citations omitted).

In assessing a plaintiff's subjective complaints, the ALJ may properly consider them in light of the other evidence of record, including objective medical evidence, plaintiff's other testimony, and plaintiff's description of his daily activities. See Hartranft v. Apfel, 181 F.3d 358, 362 (3d Cir. 1999). And so long as a plaintiff's subjective complaints have been properly addressed, the ALJ's decisions in that regard are subject only to the substantial evidence review.

[10] This evaluation process has been repeatedly reiterated with approval by the United States Supreme Court. See, e.g. Barnhart v. Thomas, 540 U.S. 20, 24-25 (2003).

assess whether the plaintiff has the ability to perform other work existing in the national economy in light of the plaintiff's age, education, and past work experience.[11]

A finding by the ALJ that the plaintiff is unable to perform his past relevant work will satisfy Plaintiff's burden and the burden then shifts to the Commissioner to show that other work exists in significant numbers in the national economy that accommodates his RFC.  See 20 C.F.R. §404.1520; Green v. Schweiker, 749 F.2d 1066, 1071 (3d Cir. 1984).[12]  Thus it must be determined whether or not there is substantial evidence in the record to support the ALJ's conclusion that Plaintiff was not disabled within the meaning of the Act.

III. Analysis

Plaintiff argues that the Commissioner's decision is not supported by substantial evidence and challenges it on the grounds that: (1) ALJ Andrew's decision is supported only by highly selective evidence; (2) ALJ Andrews failed to acknowledge the testimony of Plaintiff's Intensive Care Manager; (3) ALJ Andrews failed to accord Plaintiff's testimony appropriate credibility given his prior work history; and (4) ALJ Andrews posed an invalid hypothetical question, which failed to recognize Plaintiff's additional limitations.  (Pl.'s Brief, p.15)

---

[11] The finding of RFC is the key to the remainder of findings under the regulations.  If the plaintiff's impairment is exertional only, (*i.e.*, one which limits the strength he can exert in engaging in work activity), and if his impairment enables him to do sustained work of a sedentary, light or medium nature, and the findings of age, education, and work experience made by the ALJ coincide precisely with one of the rules set forth in Appendix 2 of the regulations, an appropriate finding is made.  If the facts of the specific case do not coincide with the parameters of one of the rules, or if the plaintiff has mixed exertional and non-exertional impairments, then the rules in Appendix 2 are used as guidelines in assisting the ALJ to properly weigh all relevant medical and vocational facts.  See 20 C.F.R. §404.1569; 20 C.F.R. pt. 404, subpt. P., app. 2, §200.00(a).

[12] The Commissioner may establish that jobs for a particular claimant exist in the national economy in several ways, including by way of the testimony of a vocational expert.  See Jesurum v. Sec. of U.S. Dep't of Health & Human Serv., 48 F.3d 114, 121 (3d Cir. 1995).

Defendant argues that the Commissioner's decision is supported by substantial evidence and should be affirmed.

First, Plaintiff attempts to demonstrate that the ALJ failed to appreciate the severity of Plaintiff's depression and "cherry-picked" the medical evidence. Plaintiff argues ALJ Andrew's decision is not supported by substantial evidence because he considered only one GAF score of 50; a statement Plaintiff made to his mental health professional; and the opinion of a consultative examiner, Dr. Haddad, who did not have access to Plaintiff's medical file. Plaintiff's characterization of the ALJ's opinion oversimplifies and ignores the weight of the evidence that ALJ Andrews used in reaching his decision.

The Court of Appeals has indicated concern for ALJ opinions that fail to properly consider, discuss, and weigh relevant medical evidence. Dobrowolsky v. Califano, 606 F.2d 403, 406-07 (3d Cir. 1979). "The Third Circuit has held that the ALJ must give some indication of the evidence which he rejects and his reasons for discounting such evidence." Emery v. Apfel, 356 F.Supp.2d 530 530, 534-35 (E.D.Pa. 2005) (citing Burnett v. Commissioner of Social Security, 220 F.3d 112, 119 (3d Cir. 2000)).[13] Although ALJ Andrews did not individually discuss every GAF score, he did discuss the range represented and explained in his conclusion that they do not show that Plaintiff was disabled for the requisite consecutive 12 month period. See 42 U.S.C. § 423(d)(1)(A). Plaintiff's lower scores were given limited weighted owing to their proximity to Plaintiff's isolated hospitalizations and his subsequent improvement and repeated, stabilized higher scores.

---

[13] See also Schaudeck v. Commissioner of Social Security, 181 F.3d 429, 433 (3d Cir. 1999)

Plaintiff also attempts to discredit the ALJ's opinion by alleging that his reliance on Plaintiff's statements made during a February 2005 appointment with Dr. Buttenfield was a "clear misrepresentation of one of Plaintiff's statements to his mental health professionals." (T.R. 15, 198; Pl.'s Brief p. 17)  Dr. Buttenfield's therapy notes show that during their appointment Plaintiff initially denied any problems, but then conveyed several life, domestic, and economic problems.[14]  Although Plaintiff's general statements about typical stresses of daily life were noted by the ALJ, he was not required to nor did he give controlling weight to these statements.  His decision certainly does not indicate that he predicated his findings on these statements or that he dismissed Plaintiff's diagnosed mental disorders based on them.  To the contrary, the ALJ merely mentions the statements and then goes on to expressly acknowledge Plaintiff's disorders, but concluded, that, given the whole of Plaintiff's objective medical record, he did not meet the standard for "disabled" under the Act.

Plaintiff also alleges that the ALJ erroneously relied on "a consultative medical examiner who did not have access to his medical file." (Pl.'s Brief p.15)  While it is not clear from the record whether Dr. Haddad had access to Plaintiff's medical files, it is clear that he was fully familiar with Plaintiff's history.  Dr. Haddad's opinion was consistent with other evidence in Plaintiff's record and, while ALJ Andrews gave weight to Dr. Haddad's opinion, he also relied on other evidence in Plaintiff's record.

In sum, the ALJ did not "cherry pick" the evidence as Plaintiff suggests.  Rather, the decision shows that he carefully weighed Plaintiff's extensive medical record and based his

---

[14] "Initially denying any problems, [Plaintiff] spontaneously began a summary of his current status: no home, no job, no income.  He has seen what little savings he had disappear, squandered by his wife, whom he allowed to turn him out of the marital home and keep his bank accounts and possessions." Individual Therapy Progress Note, Philip Buttenfield (T.R. 198)

decision on this objective record.  The ALJ clearly identified the medical evidence he relied on and gave a clear justification for his decision.  He recognized that Plaintiff suffered from "severe" mental limitations and was unable to return to past previous work, but reasonably concluded that he did not meet the standard of disability required under the Act.  His decision should be affirmed because it rests on such relevant evidence as a reasonable mind might accept as adequate to support the conclusion.  See Hartranft, 181 F.3d at 360 (citing Pierce, 487 U.S. at 565).

Second, Plaintiff argues that ALJ Andrew's decision was in clear error as it failed to acknowledge or evaluate the testimony provided by Plaintiff's ICM, Frank White.  As Plaintiff acknowledges, ICM White's testimony was essentially duplicative of the his written report, which the ALJ did expressly address in his decision.[15]  (T.R. 19)  Although ICM White's testimony went into more detail regarding Plaintiff's symptoms and treatment, the ICM's conclusion was the same; that Plaintiff could not return to work.  (T.R. 51-53)  The ALJ credited both ICM White's and Curran's letters as providing, in part, "a basis for the finding of mental limitations and restrictions, but none that would preclude all work activity," but reserved for himself, as he was entitled to do, findings of disability. (Hartranft, 181 F.3d at 360; T.R. 19)  The ALJ held that, while the Plaintiff did suffer from severe depression and was limited to simple, routine repetitive work he was not  precluded from performing all work.[16]  (T.R. 18)

---

[15] See *supra* note 7.

[16] In Addition, ICM White is not considered an "acceptable medical source."  The ALJ may only consider "acceptable medical sources" as treating sources whose medical opinions may be entitled to controlling weight.  See 20 C.F.R. §§ 404.1502, .1527(d), 416.902, .927(d); Defendant's Brief in Support of Summary Judgment, Doc. No.13 at p. 17.  The Commissioner may use evidence from "other sources," in a social security disability benefits case, to show the severity of a claimant's impairments and how they affect his ability to work, but he is not

(continued...)

Third, Plaintiff submits that ALJ Andrews' finding that Plaintiff lacked credibility is not supported by substantial evidence. The Social Security Ruling (SSR) 96-7 requires an ALJ to articulate the reasons for his credibility findings[17]. While the ALJ did not find Plaintiff's testimony that he was not able to work to be credible, he did find the remainder of Plaintiff's testimony credible. (T.R. 23, Finding 5) The ALJ acknowledged Plaintiff's work history and accepted Plaintiff's testimony that he was no longer able to perform past relevant work as a cook. However, the ALJ held that Plaintiff retained the RFC to perform other types of work at all exertional levels so long as the work did not impose excessive mental demands or require close attention to details. The ALJ fully and appropriately explained the basis for his conclusions. For example, the ALJ noted Plaintiff's own testimony regarding his ability to maintain independent life functions and the objective medical evidence as to the extent and duration of Plaintiff's limitations. (T.R. 46)

Finally, Plaintiff argues that the ALJ posed an inaccurate hypothetical to the vocational expert ("VE") as it failed to accurately portray Plaintiff's full range of limitations and impairments. Specifically, Plaintiff argues that the hypothetical failed to include limitations characterized as Plaintiff's (1) agitation, aggravation, and argumentation with co-workers and

---

(...continued)
required to apply the stringent treating source rule in evaluating such evidence. 20 C.F.R. §404.1513(d).

[17] SSR 96-7 provides, in relevant part, as follows:

> It is not sufficient for the adjudicator to make a single, conclusory statement or for the adjudicator to simply recite the factors that are described in the regulations for evaluating symptoms. The decision must contain specific reasons for the finding on credibility, supported by the evidence in the case record, and must be sufficiently specific to make clear to any subsequent reviews the weight the adjudicator gave to the evidence and the reasons for that weight.

authority figures; and (2) the additional limitation of not being able to make it to work on time consistently. (Pl's Brief, at p. 22)

The Third Circuit has held that "a hypothetical question must reflect all of a claimant's impairments that are supported by the record; otherwise the question is deficient and the expert's answer to it cannot be considered substantial evidence." Chrupcala v. Heckler, 829 F.2d 1269, 1276 (3d Cir. 1987) (citing Podedworny v. Harris, 745 F.2d 210 (3d Cir. 1984); Wallace v. Secretary, 722 F.2d 1150 (3d Cir. 1983)).[18] ALJ Andrews acknowledged Plaintiff's additional hypothetical limitations in his decision, but declined to include them because these limitations were not supported by the medical evidence. (T.R. 22) ALJ Andrews specifically observed that Plaintiff's anger had significantly improved and that Dr. Rockey's analysis of Plaintiff's social functioning indicated that he got "along fairly well with others," and "did not demonstrate any aggression or hostility during [their] evaluation." (T.R. 164) Dr. Rockey's report, on which ALJ Andrew's expressly relied, also finds that Plaintiff had no impairment in interacting appropriately with the public, supervisors, and/or co-workers. (T.R. 167) Her report is consistent with additional assessments of Dr. Haddad and Dr. Milke.[19]

Plaintiff's claim that he would not be able to get to work on time consistently is similarly lacking substantial support in the record. Dr. Milke's RFC assessment found that Plaintiff

---

[18] See also Plummer v. Apfel, 186 F.3d 422, 431-32 (3d Cir. 1999) (applying Chrupcala to conclude that the VE's testimony could be relied upon as substantial evidence that the plaintiff was not totally disabled where the hypothetical question fairly set forth every credible limitations established by the physical evidence.)

[19] Dr. Haddad's report of Oct. 13, 2003, states that while Plaintiff is socially distant it is probable that he could "interact appropriately with persons in authority, co-workers, and peers and also the public." (T.R. 177) Dr. Milke's RFC exam, Nov. 13, 2003, similarly notes that Plaintiff has only moderate difficulties in maintaining social functioning and no significant limitations in the ability to take instruction and criticisms from supervisors and get along with co-workers. (T.R. 193-94)

"would be able to maintain regular attendance and be punctual." (T.R. 193-194) Dr. Rockey's report prognosis was that Plaintiff could not return to gainful employment at that time due to his need to attend an intensive therapy program for 25 hours each week. (T.R. 165) According to the record, Plaintiff is no longer participating in this program and, therefore, does not have the same time constraints.[20]

This court is not unsympathetic to Plaintiff's severe mental health issues, nor to his long employment history as a short order cook. However, the record before this Court will simply not support a reversal or even remand of ALJ Andrews' decision that Plaintiff was not disabled within the meaning of the Act. The ALJ thoroughly reviewed the objective medical record, the evaluations of his medical evaluators and ICMs, and testimony of the Plaintiff. A detailed review of the entire record demonstrates that ALJ Andrews' decision is supported by substantial evidence.

IV. Conclusion

For the reasons discussed above, it is recommended that the Motion for Summary Judgment filed by Plaintiff (Docket No. 9) be denied and that the decision of the Commissioner to deny Plaintiff supplemental security income be affirmed.

In accordance with the Magistrate Judges Act, 28 U.S.C. §636(b)(1)(B) and (C), and Rule 72.1.4(B) of the Local Rules for Magistrate Judges, the parties are allowed ten (10) days from the date of service to file objections to this report and recommendation. Any party opposing the objections shall have ten (10) days from the date of service of objections to respond thereto. Failure to file timely objections may constitute a waiver of any appellate rights.

---

[20] Although there may be contradictory evidence in the record, it will not be cause for remand or reversal of the ALJ's decision so long as substantial support exists. Skyes, 228 F.3d at 262.

Dated: August 27, 2007                               s/ Lisa Pupo Lenihan
                                                     Lisa Pupo Lenihan
                                                     U.S. Magistrate Judge



cc      All counsel of record.